IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ROBERT MONTANEZ,
      Plaintiff,

vs.                            Case No.: 3:13cv503/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
      Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 22, 23).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Acting Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the final decision of the Commissioner shall be affirmed.

I.      PROCEDURAL HISTORY

On October 26, 2009, Plaintiff filed an application for SSI, and on March 22, 2010, he filed an application for DIB (tr. 23).[1]  In each application he alleged disability beginning October 6, 2006

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on January 30, 2014 (doc. 17).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

(*id*.), although he subsequently amended the alleged disability onset date to October 16, 2009 (*see* tr. 44).[2]  His applications were denied initially and on reconsideration, and thereafter he requested a hearing before an administrative law judge ("ALJ").  A hearing was held on March 26, 2012, and on June 29, 2012, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (tr. 23–34).  The Appeals Council subsequently denied Plaintiff's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

## II.    FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* tr. 25–34):

(a)    Plaintiff met the insured requirements of the Act, for DIB purposes, through December 31, 2012[3];

(b)    Although Plaintiff worked during a portion of the relevant period, his work did not rise to the level of substantial gainful activity ("SGA"), and thus Plaintiff did not engage in SGA during the relevant period;

(c)    Plaintiff had four severe impairments: T-10 compression fracture, degenerative disc disease ("DDD") of the lumbar spine, benign positional vertigo, and carpal tunnel syndrome ("CTS"), but he had no impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(d)    Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[4] and could occasionally climb ramps and stairs

---

[2] Plaintiff amended the disability onset date to October 16, 2009, because his prior applications for DIB and SSI were denied by a final decision of the Commissioner on the previous day, October 15, 2009 (*see* tr. 44).  Plaintiff appealed the prior decision to this court in Case No. 3:11cv65/MCR/EMT, and the prior decision was affirmed on March 22, 2012 (*see* Case No. 3:11cv65/MCR/EMT, docs. 14, 15, 16).

[3] Thus, the time frame relevant to Plaintiff's claim for DIB is October 16, 2009 (amended alleged onset date), through June 29, 2012 (the date the ALJ issued her decision), even though Plaintiff was insured through December 2012.  The time frame relevant to his claim for SSI is the same.  *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).  The court will refer to this time frame—that is, from October 16, 2009, through June 29, 2012—as "the relevant period."

[4] Light work is defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the

but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasionally perform work overhead, by either lifting or carrying; frequently handle, finger, feel, and push or pull arm controls; and occasionally push and pull leg controls.  He could not work at unprotected heights, operate automotive equipment, or work around hazardous machinery, and he would be limited to jobs involving simple, routine, or repetitive tasks that require maintaining attention and concentration for up to two hours at a time.

(e)     Plaintiff could not perform his past relevant work due to the exertional demands of that work, but he could perform other available work which accommodated his RFC and other factors; thus, he was not disabled between October 16, 2009, and June 29, 2012.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.

---

time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

<u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).  Pursuant to 20 C.F.R. § 404.1520(a)–(g),[5] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing SGA, he is not disabled.

2.      If the claimant is not performing SGA, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing SGA and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment,

---

[5] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, citations in this Order should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL AND MEDICAL HISTORY and TESTIMONY OF THE VOCATIONAL EXPERT

A.    Personal History

Plaintiff was born on October 31, 1963, and thus was forty-five years of age on the date he alleges he became disabled (tr. 45).  He has a high school education and past relevant work as a merchandise deliverer, dump truck driver, warehouse worker, insulation installer, and tractor-trailer truck driver (tr. 32, 45).  He last worked on a regular basis in 2008, although he reported working some in 2010, and earnings records show he worked to some extent in 2009, 2010, and 2011 (see tr. 25; see also, e.g., tr. 147, 149).  Nevertheless, as previously noted, the work Plaintiff performed after October of 2009 does not constitute SGA.

Plaintiff testified at his hearing before the ALJ, held March 26, 2012, that he has vertigo, right wrist tenderness and tendonitis, back pain, hip pain, arthritis in his right hip, and probable arthritis in his left hip (tr. 47–48).  Plaintiff testified that his pain—which he rated at a "seven to ten" on "nine to ten[-point scale]" and described as variable "depending on the weather and if it's a good or a bad day"— prevents him from working (tr. 48–49).  He stated that the vertigo "has something to do with the [inner] ear," "comes out of nowhere," occurs "a couple of times a week," and lasts "anywhere from a couple of hours to a day or two," but he has not been referred to a specialist for treatment (tr. 47–48; see also tr. 306).  Plaintiff testified that he takes hydrocodone for pain; Celebrex, but previously Motrin, for arthritis; meclizine for vertigo; and Ambien for insomnia (tr. 49).  He stated he tries to take the meclizine daily and noted that it "puts him to sleep" (id.).  Plaintiff reported that on an average day he lies down half or all of the day and has to do so because of his pain and/or medications (id.).  Finally, Plaintiff testified that although he previously had left shoulder surgery, the shoulder is "fine" (tr. 48).

B.      Testimony of the Vocational Expert ("VE")

Leslie Gallespie, a VE, testified at Plaintiff's hearing before the ALJ.  She opined that a hypothetical person with Plaintiff's RFC could not perform his past relevant work because that work was performed at either a medium or heavy level of exertion, and Plaintiff's RFC limits him to light work (tr. 50–51).  The hypothetical person could, however, perform other available work such as a mail clerk (light, unskilled), counter clerk (light, unskilled), or electrical accessories assembler (light, unskilled) (*id*.).  The VE explained that one conflict between the Dictionary of Occupational Titles ("DOT") and her testimony existed, she explained the conflict, and she indicated that because of the conflict she was supplementing the information derived from the DOT; she then confirmed that Plaintiff could perform the jobs she previously identified (*see* tr. 52).

In response to questioning by Plaintiff's attorney, VE Gallespie testified that the same hypothetical person could not perform the aforementioned jobs if he could not sustain concentration for up to two hours due to pain or medication side effects (tr. 53).  She additionally noted that standard work breaks occur approximately every two hours, so if the hypothetical person's need for a break in concentration was "within a few minutes" of two hours it would not have a significant impact on the ability to work, but if the need arose after only an hour or even an hour and a half, it would preclude work in the jobs she had identified (*id*.).[6]

C.      Relevant Medical History[7]

(1)      Evidence that Pre-Dates October 16, 2009 (the Amended Onset Date)

In December 2005, Plaintiff presented to an emergency room with complaints of pain in his right thoracic back, after "pull[ing] something in his back" (tr. 255).  A general review of his symptoms was negative (*id*.).  Plaintiff was assessed with acute strain of the right thoracic back and prescribed a muscle relaxant and anti-inflammatory medication (tr. 256).  In October 2006, while working as an insulation installer, Plaintiff injured himself when he reached forward to secure an

---

[6] During Plaintiff's hearing, the ALJ indicated she would refer Plaintiff for an orthopedic consultative examination and for lumbar and thoracic x-rays (tr. 49–50), and the file reflects that she did so (*see* tr. 376–87, 375).

[7] The record contains some evidence regarding Plaintiff's mental health, but none of the issues raised in this appeal concern his mental health; therefore, such evidence is not included herein unless it touches upon Plaintiff's physical condition or capacities.

insulation roll that was falling off his shoulder (*see* tr. 246).[8]  Cervical and lumbar spine x-rays revealed no abnormalities, and a thoracic spine x-ray revealed mild anterior wedging at T-10 but was otherwise normal (tr. 246, 261).  Plaintiff, however, was asymptomatic at the T-10 level, though he displayed some tenderness at T-7–T-8 (tr. 244).  Plaintiff was restricted to light duty work (*see* tr. 248), which restriction continued through December 2006, as noted in a treatment record authored by Stephen A. Slobodian, M.D., a specialist in spinal cord injuries and physical medicine and rehabilitation (*see* tr. 245, 349).  A January 2007 magnetic resonance imaging scan ("MRI") of the thoracic spine revealed a slight disc protrusion at T-7–T-8 with very slight effacement (tr. 244). Also in January 2007, Plaintiff stated that he "fe[lt] he could advance his work capabilities," and by February 2007 Dr. Slobodian cleared Plaintiff for light to medium work (*see* tr. 244, 243).  During follow-up visits in March and May 2007, Dr. Slobodain opined that Plaintiff achieved maximum medical improvement (as of March 13, 2007), with a 4% whole body impairment rating, and he released Plaintiff to light to medium work "on an indefinite basis" (tr. 241–42).

In November 2007, an MRI of the cervical spine was obtained due to Plaintiff's complaints of neck pain (tr. 260).  The MRI was "normal" and provided no "explanation to account for" the pain Plaintiff reported (*id*.).  Additionally, an MRI of Plaintiff's left ankle was obtained in August 2008.  It revealed a small joint effusion but was otherwise negative (tr. 282).

On June 2, 2009, Plaintiff presented to Anju Garg, M.D., for a physical examination for the Department of Transportation (*see* tr. 281).[9]  Plaintiff complained of headaches, back pain, neck pain, and right wrist pain, and he rated his overall "pain" at a five on a ten-point scale (*see id*.).  Dr. Garg noted tenderness and a positive Tinel's sign in the right wrist, tenderness and rigidity in the thoracic and lumbo-sacral spine, and tenderness in the left ankle, but no deformities or swelling were observed in any of these areas (*id*.).  Dr. Garg also reported decreased ranges of motion, to an

---

[8] In Plaintiff's prior applications for DIB and SSI, he originally alleged a disability onset date of October 6, 2006, which coincided with the work-related injury, though he later amended the onset date to May 18, 2008 (*see, e.g.*, Case No. 3:11cv65/MCR/EMT, doc. 14 at 1).

[9] Although the June 2, 2009, treatment record is the earliest-dated record from Dr. Garg in the instant case record, the record from Plaintiff's earlier appeal reflects that he was a patient of both Anju Garg and Purushottam K. (or "P.K.") Garg, M.D., of the Davis Highway Family Practice, for many years, including during 2007, 2008, and 2009 (*see, e.g.*, Case No. 3:11cv65/MCR/EMT (docs. 10, 14)).

unspecified extent, in the ankle and spinal areas secondary to pain (*id.*).  Neurological findings, such as motor and sensory reflexes, were all normal (*id.*).  Dr. Garg assessed mid-back pain due to T-10 compression fracture, lower back pain with radiculopathies, right wrist pain, CTS, left ankle pain, headaches, neck pain with radiculopathies, insomnia, and anxiety (*id.*).  Dr. Garg prescribed no medications and recommended no radiological testing (*id.*).

>       (2)    Evidence that Post-Dates October 16, 2009 (the Amended Alleged Onset Date)

The only treatment records from the relevant time frame are all from Dr. Anju Garg and/or Dr. P.K. Garg.[10]  The first treatment record from the relevant period, dated October 30, 2009, is missing a small portion, but it appears to be nearly identical to the record created by Dr. Garg following Plaintiff's June 2009 examination for the Department of Transportation (*compare* tr. 348 *with* tr. 281), although an additional diagnosis—spastic bronchitis—appears in the October record, and in October Plaintiff rated his pain at a "10+" (tr. 348).  The second treatment record from the relevant period, dated December 7, 2009, is sparse and essentially notes that Plaintiff was there for follow-up for his complaints of lower and mid-back pain, headaches, insomnia, neck pain, and left ankle pain (tr. 347).  Thereafter, Dr. Garg's treatment records reflect that Plaintiff presented for at least one follow-up visit in every month of 2010; the months of January, July, and August of 2011; and the months of February, March, April, May, and June of 2012 (*see* tr. 326–47, 355–74, 388–95).

Dr. Garg's 2010 records are generally the same as the June, October, and December 2009 records.  For example, they generally reflect: (1) Plaintiff's complaints of—and follow up for—mid-back pain, headaches, insomnia, neck pain, and left ankle pain; (2) Dr. Garg's assessments of benign positional vertigo, mid-back pain due to T-10 compression fracture, left ankle pain, lower back pain with radiculopathies, right wrist pain and CTS with positive Tinel's sign, headaches, neck pain with radiculopathies, insomnia, anxiety, left ankle pain, and tobacco abuse; (3) physical findings consistent with those found during the June 2009 examination for the Department of Transportation; (4) prescriptions for medications to treat Plaintiff's pain (including Darvocet, Vicodin, and/or Tylenol), anxiety (Valium), and sleeplessness (Ambien), among other medications that were prescribed to treat various conditions not at issue in this appeal; (5) no referral to a specialist for radiological testing or other testing, such as blood testing or similar labwork; (6) the imposition of

---

[10] For ease of reference, when referring to either Dr. Anju Garg or Dr. P.K. Garg, the court will refer to the physician as "Dr. Garg."

no work-related or other physical restrictions; and (7) a recommendation that Plaintiff return for follow up in two weeks (*see* tr. 326–47, 374, 372).  Plaintiff rated his pain, on a ten-point scale, in 2010 as follows: "10+" (between January and early May), "5" (in late May), "7" (in early June), "7–8" (in late June), "7" (in July), "5–6" (between August and early November), and "9" (in late November and December) (*id.*).  On one occasion Plaintiff reported that he broke his right foot, and he was referred for an x-ray of the right foot, the results of which do not appear to be included in the record (tr. 344).  Additionally, in June and July 2010 Plaintiff complained of pain in the hips,  thighs, and/or legs, but no adjustments were made to Plaintiff's medications, Dr. Garg's diagnoses, or Dr. Garg's course of treatment (*see* tr. 332, 331).  In November 2010, Dr. Garg indicated that Plaintiff would be referred for trigger point injections at the "C[ervical] spine left paraspinal muscles x 4," apparently based on Plaintiff's continued reports of neck pain (tr. 374).  Dr. Garg also prescribed Voltaren gel and a Lidoderm patch for pain (*id.*).  The treatment notes from Plaintiff's follow-up visit in December 2010 include no mention of trigger point injections (nor do any treatment notes from 2011 and 2012); it is thus appears that Plaintiff did not obtain them (*see* tr. 372).

On September 2, 2010, Harry Beecham, M.D., completed a Physical RFC Assessment after reviewing the evidence in Plaintiff's claims file (tr. 298–305).  In summary, Dr. Beecham opined that Plaintiff could perform light work (*see* tr. 299; *see also* footnote 4, *supra*) and had no postural, manipulative, visual, communicative, or environmental limitations (tr. 300–02).  Dr. Beecham also opined that the severity or duration of Plaintiff's reported symptoms (e.g., that he could "only walk 2 ½ yards before having to rest for 30–45 minutes"; that he "uses a cane at all times"; and that "his wife has to help with putting on his pants, shoes and socks and helps him wash in the shower and . . . with shaving him due to muscle spasms") was disproportionate to the expected severity or duration of his impairments.[11]

On September 22, 2010, during a consultative psychological examination, Plaintiff described his "typical day as waking around 6:00 a.m. and spending most days watching television" (tr. 308). He sated that on days when he feels "physically [okay]," he might be more active and engage in

---

[11] Plaintiff reported these or similar limitations  to an agency representative on August 8, 2010 (*see* tr. 198–205), although on August 17, 2010, he advised an agency representative that he "occasionally" uses a cane and "care[s] for his hygiene" (tr. 210).

activities such as folding clothes or running errands with his wife (*id.*).  He also reported he needed no physical assistance in performing "self-care activities" or driving short distances (*id.*).

Dr. Garg's treatment records from January, July, and August of 2011 are generally the same as the earlier treatment records.  They do reflect, what Dr. Garg characterized as, a "new" complaint of bilateral hip pain in January, worse on the right (tr. 370).  Plaintiff reported that the hip pain had existed "on and off" for about a year, but in the past week it had been "constant" (*id.*).  He also rated his overall pain at a "5" on a ten-point scale during his January visit (*id.*), as he did again in July and August of 2011 (tr. 367, 365).

In early February 2012, Plaintiff presented to Dr. Garg with generally the same complaints as before, and he rated his pain at a "7" on a ten-point scale (*see* tr. 363).  Dr. Garg prescribed ibuprofen and Lortab and referred Plaintiff for laboratory testing, namely, a "CBC" (complete blood count) (*id.*).  Dr. Garg's treatment record from late February 2012 suggests that Plaintiff had not yet obtained the CBC, as it is listed in the "plan" section of the record (tr. 361).  An x-ray of the right hand was also planned (*id.*).  Plaintiff rated his pain at "8–9" on a ten-point scale (*id.*).  Dr. Garg's diagnoses remained the same (*id.*).  The treatment records from late February and early March 2012 note an additional finding upon physical examination: "right hand tenderness over [the] 4th and 5th metatarsal bones distally" but, as before, no deformity or swelling (tr. 359, 361).  At the March visit, Plaintiff rated his pain at "8" on a ten-point scale, although on this occasion—unlike on any prior occasion—the rating was specifically in reference to Plaintiff's "right hand pain" (tr. 359).  In late March 2012, Dr. Garg included in Plaintiff's "plan" an x-ray of the right hip, but otherwise the treatment record is generally the same as the earlier 2012 records (*see* tr. 357).  A treatment record from late March 2012 notes that the x-ray of the right hand revealed an unspecified "deformity" (tr. 355).  The remaining treatment records, from April, May, and June of 2012, are not remarkably different from the earlier records, although in April Dr. Garg additionally assessed osteoarthritis of the right hip and right ulnar neuropathy and noted that Plaintiff would be referred to an orthopedic physician "for [his] right hand" (tr. 392).  The May 2012 record notes a report by Plaintiff that he had an appointment "with ortho for his hand on 5/23/12—Dr. Symoniak" (tr. 390).  Dr. Garg's

treatment record from June 2012 includes a report by Plaintiff that he "saw orthopedic on 5/23/12 and he sent him for nerve conduction study [sic]" (tr. 388).[12]

On May 10, 2012, Plaintiff underwent an consultative examination by Leo Chen, M.D., an orthopedic surgeon (*see* tr. 376–87). Plaintiff reported chronic and progressive low to mid-back pain since his on-the-job injury in October 2006 (tr. 376). Plaintiff stated that the pain radiated into his legs with occasional associated numbness and tingling (*id*.). Plaintiff also reported that he had bilateral CTS, greater on the right than the left, for which he reportedly wore wrist braces, though he was not wearing braces at the time of his examination (*id*.). Similarly, Plaintiff reported that he had occasionally used a cane for ambulation "over the past month," but he did not have a cane with him (*id*.). Plaintiff noted that his current medications were Lortab, meclizine, Ambien, ibuprofen, and Buspar (*id*.). Dr. Chen evidently reviewed Plaintiff x-rays (or the results thereof), which were obtained at or about the time of Dr. Chen's examination, and made the following observations: (1) lumbar spine x-rays show minimal to mild degenerative changes diffusely, lordotic alignment, and no acute bony injury; (2) cervical spine x-rays show no acute bony injury; and (3) thoracic spine x-rays show slight anterior wedging of the T-10 vertebra consistent with a previous compression fracture, kyphotic alignment, and otherwise no acute findings (tr. 377). Plaintiff reported that he previously underwent surgery of the left shoulder to repair the rotator cuff and stated that his shoulder is now "doing very well" (tr. 376).

Upon examination, Plaintiff had full range of motion in his "neck, back, and extremities" (tr. 377) or, more specifically, in the cervical spine, lumbar spine, shoulders, elbows, wrists, hands, hips, knees, ankles, and great toes (tr. 379–81). Plaintiff's gait was normal, and he could toe, heel, and tandem walk without difficulty (tr. 377). Seated straight leg raising tests were negative, and no signs of joint discoloration, deformity, or inflammation were observed (*id*.). Dr. Chen did note a "slight[ly] positive" Tinel's sign at the right wrist and "subjective numbness in [Plaintiff's] median three nerves on the right, much greater than the left," but he observed that Plaintiff's grip strength was symmetric and that he could perform fine manipulations, such as turning a doorknob or using

---

[12] The court did not locate in the record a report or treatment record from Dr. Symoniak or any other orthopedic physician, other than a report provided a consultative examiner. Likewise, the court found no results of a nerve conduction study, which was apparently recommended by Dr. Symoniak or another orthopedic physician, or of a CBC and right hip x-ray, which were both recommended by Dr. Garg.

glasses (*id*.).  Dr. Chen assessed chronic low back pain with history of T-10 compression fracture and bilateral CTS, right greater than left (tr. 378).  In conclusion, Dr. Chen stated that Plaintiff's ability to perform physical activity "may be somewhat limited" and that Plaintiff's limitations are "best delineated on the capacity form" (*id*.).  The capacity form to which Dr. Chen referred is titled "Medical Source Statement of Ability to do Work-Related Activities (Physical)" and was completed by Dr. Chen on May 10, 2012 (*see* tr. 382–87).  In summary, it reflects Dr. Chen's opinions that Plaintiff can lift or carry up to ten pounds continuously, twenty pounds frequently, and fifty pounds occasionally (tr. 382).  Plaintiff is also able to sit twenty minutes at a time, for a total of four hours in an eight-hour workday; stand fifteen minutes at time, for a total of three hours in an eight-hour workday; and walk fifteen minutes at time, for a total of three hours in an eight-hour workday (tr. 383).  He does not need a cane for ambulation (*id*.).  Additionally, Plaintiff can continuously reach in any direction, handle, push, pull, and operate foot controls, bilaterally; and he can frequently feel or finger, bilaterally (tr. 384).  Plaintiff is also able to occasionally climb ladders or scaffolds and frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs (tr. 385).  Finally, Dr. Chen opined that Plaintiff can perform all listed activities of daily living and can continuously be exposed to all environmental conditions, with one exception, namely, he is able operate a motor vehicle only "frequently" (tr. 386–87).

V.     DISCUSSION

Plaintiff contends  the ALJ erred in evaluating the opinions of Dr. Beecham and Dr. Chen, by posing an incomplete hypothetical question to the VE, and in evaluating his subjective complaints of pain and other symptoms.

A.     The Opinions of Dr. Beecham and Dr. Chen

Plaintiff contends the ALJ erred in assigning great weight to the opinions of "Dr. Harry Beech [sic], M.D.," a non-examining agency physician, who rendered his opinions in September 2010—well prior to the end of the relevant period—and did so based on an incomplete record (*see* doc. 19 at 7–11).  Plaintiff additionally claims the ALJ erred in failing to incorporate into his RFC all of the limitations assessed by Dr. Chen, a specialist who examined Plaintiff and rendered his opinions in May 2012—near the end of the relevant period—and did so based on a complete record (*id*.).

The Eleventh Circuit has noted that the focus of any RFC assessment is on the doctors' evaluations of a claimant's condition and the resulting medical consequences.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  An ALJ must consider and evaluate every medical opinion received.  20 C.F.R. § 404.1527.  Additionally, in assessing the medical evidence the ALJ must "state with particularity the weight [s]he gave the different medical opinions and the reasons therefor."  Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) (citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)).  Thus, while it is true the determination of disability under the Act is reserved to the Commissioner, the ALJ is nevertheless required to consider and explain the weight given to opinions of medical doctors.  See 20 C.F.R. § 404.1527(d); McCloud v. Barnhart, 166 F. App'x 410, 419 (11th Cir. 2006) (unpublished) (remanding where ALJ did not explain weight given to consulting psychologist's report or the reasons for discrediting his opinion).[13]  Although the ALJ has wide latitude to evaluate the weight of the evidence, she must do so in accordance with prevailing precedent.  Pursuant to the regulations, the weight an ALJ must give medical opinions varies according to the relationship between the medical professional and the claimant.  20 C.F.R. § 404.1527(c).  For example, the opinions of examining physicians are generally given more weight than non-examining physicians, treating physicians' opinions receive more weight than the opinions of non-treating physicians' opinions, and specialists' opinions on issues within their areas of expertise receive more weight than non-specialists' opinions.  See id.; Preston v. Astrue, No. 2:09-cv-0485-SRW, 2010 WL 2465530, at *6 (N.D. Ala. June 15, 2010).  With respect to non-examining State agency medical consultants or other program physicians, the regulations explain that an ALJ is required to consider their opinions because they "are highly qualified physicians . . . who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1527(e)(2)(i).  An ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources.  Edwards v. Sullivan, 937 F.2d 580, 584–85 (11th Cir. 1991).  Where the ALJ has discounted the opinion of an examining source properly, however, the ALJ may rely on the contrary opinions of non-examining sources.  See Milner v. Barnhart, 275 F. App'x 947 (11th Cir. 2008) (unpublished)

---

[13] The undersigned cites McCloud and other unpublished cases herein only as persuasive authority and recognizes that such opinions are not considered binding precedent.  See U.S. Ct. of App. 11th Cir. Rule 36-2.  The undersigned does the same with respect to opinions of circuit courts of appeals other than the Eleventh Circuit, see United States v. Rosenthal, 763 F.2d 1291, 1294 n.4 (11th Cir. 1985), and any district court opinions cited herein.

(where ALJ rejected conflicting opinion of one-time examining physician properly, ALJ did not err by giving substantial weight to the opinions of non-examining physicians).

In the instant case, the ALJ stated she was assigning "great weight" to the opinions of Dr. Beecham and specifically noted that his opinions, which correlate with a finding that Plaintiff is capable of performing light work, are "generally consistent" with the findings of Dr. Chen, an examining source, and Dr. Garg, a treating source, as well as the record as a whole (*see* tr. 32). The ALJ's findings and conclusions are supported by the record.

As the ALJ noted, and as detailed *supra*, "Dr. Chen's examination findings were essentially normal" (tr. 30). The ALJ also correctly noted that Dr. Garg's findings upon multiple examinations of Plaintiff were "generally consistent" with Dr. Beecham's opinions. The ALJ acknowledged that Dr. Garg reported tenderness and a positive Tinel's sign in the right wrist, tenderness and rigidity or reduced range of motion ("ROM") in the spine, and tenderness in the left ankle (but no deformities or swelling in any of these areas), but she also correctly noted that all of Dr. Garg's "other findings were normal" (tr. 29). Furthermore, the ALJ included in Plaintiff's RFC postural limitations—i.e., limitations relating to climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling—and she stated she did so specifically to "accommodate Dr. Garg's findings of tenderness, rigidity, and reduced [ROM]" (tr. 30).[14] What is more, although the opinions of Dr. Beecham and Dr. Chen are not entirely consistent (*compare* tr. 299–302 *with* tr. 382–87), where their opinions differ, the inconsistencies—save one—were resolved in Plaintiff's favor, and even some limitations that were not assessed by either physician were included in the RFC. For example, the ALJ included in Plaintiff's RFC:

(1)      Dr. Beecham's opinion that Plaintiff could lift or carry up to twenty pounds occasionally and ten pounds frequently (*see* tr. 299), not Dr. Chen's opinion that Plaintiff could lift or carry up to fifty pounds frequently and twenty pounds occasionally (*see* tr. 382);

(2)      Limitations to occasional or frequent use of the upper extremities, depending on the type of activity, which limitations are the same as or more restrictive than the limitations assessed by Dr. Chen (*see* tr. 384) (Dr. Beecham imposed no upper extremity limitations (*see* tr. 301));

---

[14] The ALJ additionally noted that Dr. Garg "did not specifically identify the amount of the loss of [ROM] or identify [or impose] any functional limitations" (tr. 30), and thus there were no specific limitations assessed by Dr. Garg that the ALJ could have included in the RFC (or rejected as unsupported by the record).

(3)      Environmental limitations, including a total restriction from working at unprotected heights, operating automotive equipment, or working around hazardous machinery, though Dr. Beecham assessed no environmental limitations whatsoever (*see* tr. 302), and Dr. Chen assessed only one (namely, that Plaintiff was limited to "frequent" driving of a car (*see* tr. 386));

(4)      A total restriction from climbing ladders and scaffolds, though Dr. Chen opined that Plaintiff could occasionally climb ladders and scaffolds (tr. 385), and Dr. Beecham opined that Plaintiff had no restrictions in this regard (tr. 300); and

(5)      Postural limitations, as noted *supra*, though none were assessed by Dr. Beecham (tr. 300).[15]

As Plaintiff notes, however, Dr. Chen additionally opined that Plaintiff could sit, in twenty-minute increments, for a total of four hours in an eight-hour workday, and stand or walk, in fifteen-minute increments, for a total of three hours (per activity) in an eight-hour workday, and the ALJ did not incorporate the "incremental  limitations" in the RFC or the total amount of hours Plaintiff could sit, stand, or walk in a workday (hereinafter, these opinions of Dr. Chen, collectively, will be referred to as his "frequent changes of position" opinion or limitation).  The ALJ did not err in failing to include this limitation in the RFC.

The ALJ specifically acknowledged the opinion, but she discredited it as inconsistent with Dr. Chen's own findings upon examination and with the record as a whole (tr. 32).  The ALJ's conclusion is amply supported by the record.  Dr. Chen's examination revealed, among other findings, that Plaintiff had no deficits in ROM, had negative straight leg raising tests, had a normal gait, and was able to heel, toe, and tandem walk.  Moreover, after examining Plaintiff Dr. Chen opined, in pertinent part, that Plaintiff could occasionally lift or carry fifty pounds, continuously (i.e., more than two-thirds of the day) use both feet to operate foot controls, and perform all listed activities of daily living (*see* tr. 376–87).  Thus, as the ALJ concluded, Dr. Chen's findings upon examination do not support his frequent changes of position opinion.  The ALJ also found that Dr. Chen's opinion is inconsistent with Dr. Garg's treatment records, stating "Dr. Garg's treatment records show some abnormal findings but nothing that would support [the frequent changes of

---

[15] As can be seen, although the ALJ stated she was assigning "great weight" to Dr. Beecham's opinions, it is evident from her inclusion of multiple limitations in the RFC—that were not assessed by Dr. Beecham—that the ALJ did not rely solely on Dr. Beecham's opinions in formulating Plaintiff's RFC.

position] limitation" (tr. 32).  This finding is also well supported by the record.  Dr. Garg's treatment notes reflect a conservative course of treatment, intermittent treatment (i.e., Plaintiff saw Dr. Garg on only three occasions in 2011), largely normal findings upon multiple examinations, no physician-imposed functional limitations, no surgical referral, no referral to a specialist,[16] and no hospitalizations for back, neck, or hip pain (*see* tr. 30–32).   Continuing, the ALJ noted that Plaintiff was treated by Dr. Slobodian, a specialist, from approximately December 2006 through May 2007, following Plaintiff's October 2006 work-related injury.   And the ALJ pointed out: (1) that Dr. Slobodian had reviewed Plaintiff's x-rays and MRIs—including those that document the slight disc protrusion at T-7–T-8 and the mild anterior wedging/compression fracture at T-10—but nevertheless assessed only a 4% whole person impairment rating and cleared Plaintiff for light to medium work "indefinitely" in March 2007 (*see* tr. 29–30)[17]; and (2) that objective testing after March 2007 did not document a significant worsening of Plaintiff's condition.  In support of the latter observation, the ALJ referenced Plaintiff's November 2007 cervical spine MRI, which revealed no abnormalities, and the x-rays obtained by Dr. Chen in May 2012, which showed the same impairment at T-10 and a normal cervical spine (tr. 29).[18]  Finally, the ALJ noted that the August 2008 MRI of Plaintiff's left ankle showed only a small joint effusion (*id.*), and does not support a finding that—for example—Plaintiff cannot stand or walk for more than fifteen minutes, as Dr. Chen opined.  Thus, the objective medical evidence does not document a significant worsening of Plaintiff's condition after Dr. Slobodian released him to light to medium work or, correspondingly, support a finding that Plaintiff requires frequent changes of position, as Dr. Chen opined.  *See, e.g.*, Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004) (opinion of one-time consultative psychological examiner properly discounted where inconsistent with opinions or findings of treating psychiatrist).

---

[16] In or about May 2012, Dr. Garg indicated that Plaintiff would be referred to specialist for his right wrist/hand, but this referral does not undermine the ALJ's analysis because the frequent changes of position opinion was not imposed to account for Plaintiff's right wrist impairment.

[17] It is worth noting that Dr. Slobodian initially released Plaintiff to light duty work (*see, e.g.*, tr. 248).  It thus appears that Dr. Slobodian never restricted Plaintiff from working altogether or imposed restrictions greater than those set forth in Plaintiff's RFC.

[18] The May 2012 x-rays obtained by Dr. Chen did reveal mild DDD of the lumbar spine, which the ALJ noted (tr. 30).  The ALJ also found this to be a severe impairment and considered it in determining Plaintiff's RFC.

Based on the foregoing, the ALJ did not err in evaluating the opinions of Dr. Beecham and Dr. Chen.  It evident that the ALJ considered all the relevant evidence of record in formulating Plaintiff's RFC.  She adopted all of Dr. Beecham's restrictions and added to them multiple other restrictions, most of which were assessed by Dr. Chen, and others of which were not even assessed by Dr. Chen or assessed by him to as great an extent.  Although the ALJ rejected one opinion of Dr. Chen, she articulated multiple reasons for doing so, and the reasons she cited are supported by substantial evidence on the record as a whole.  Therefore, there is no error, and Plaintiff is not entitled to relief on this claim.

> B.       Hypothetical Questions Posed to the VE

Plaintiff claims the ALJ posed an incomplete hypothetical question to the VE and thus erred in relying on the VE's testimony to find him "not disabled" (doc. 19 at 11–13).  More specifically, Plaintiff contends the ALJ erred by failing to include in the hypothetical question certain limitations regarding the use of Plaintiff's left hand.

A hypothetical question must comprehensively describe the claimant's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, the ALJ is not required to include findings in the hypothetical that she has properly rejected as unsupported.  See McSwain v. Bowen, 814 F.2d 617, 620 n.1 (11th Cir. 1987).

With respect to the use of Plaintiff's left (and right) upper extremity, Plaintiff's RFC limits him to occasionally performing work overhead and frequently handling, fingering, feeling, and pushing or pulling arm controls.  When the ALJ questioned the VE, however, she limited the "frequent" handling and fingering restriction to Plaintiff's right hand only.  More specifically, in relevant part the ALJ described the hypothetical person as someone who could perform a reduced range of light work and "could occasionally perform work overhead, either lifting or carrying.  With the right hand the – – this individual could frequently handle and finger as opposed to repetitively." (tr. 51).

Though the ALJ posed a hypothetical question to the VE which indicated that the limitation to frequent handling and fingering applied only to the right hand, the ALJ committed no error which entitles Plaintiff to relief.  Initially, Plaintiff is right-hand dominant (tr. 171), so he would be expected to perform handling and fingering activities with his right hand.  Moreover, the record that

was before the ALJ at the time of Plaintiff's hearing consistently indicates that Plaintiff's problems involved—indeed were limited to—his right hand.  For example, Dr. Garg's records repeatedly reflect Plaintiff's complaints of pain in the right wrist, and they note tenderness and/or a positive Tinel's sign in the right wrist, but no such complaints or notations appear with respect to the left wrist (of which the court is aware or which Plaintiff has pointed to).  Dr. Garg's records also reflect diagnoses of right wrist pain and CTS, and an indication in early 2012 that Plaintiff would be referred to a specialist for treatment of the right hand and for x-rays of the right wrist, which x-rays were obtained and revealed a "deformity."  Additionally, before the ALJ questioned the VE at Plaintiff's hearing, Plaintiff had just testified that he had tenderness and tendonitis in the right wrist (tr. 48).  He also noted that his left shoulder was "fine" (*id.*).  Thus, given that Plaintiff is right-hand dominant, and the record contains repeated references to problems with his right wrist/hand, the ALJ justifiably emphasized to the VE that Plaintiff would be limited in the use of his right hand (and emphasized that the limitation to "frequent" meant that "repetitive" or continuous use of the right hand for handling or fingering would exceed the RFC) (*see* tr. 51).

Following Plaintiff's hearing he was examined by Dr. Chen.  It was during this examination that Plaintiff reported he had bilateral CTS and that he wore wrist braces on both hands (tr. 376).  Additionally, Dr. Chen restricted Plaintiff to "frequent" fingering and feeling (tr. 384).  The ALJ, however, did not have the benefit of Dr. Chen's report at the time she questioned the VE, but she did have it at the time she issued her decision, and she incorporated into Plaintiff's RFC a limitation to frequent fingering and feeling (fine manipulation) and frequent handling (gross manipulation), bilaterally.[19]  Nevertheless, the ALJ correctly observed that although Plaintiff reported bilateral CTS to Dr. Chen, he stated it was worse on the right, and although he reported wearing braces on both wrists he wore none at the time of his examination (tr. 29).[20]  The ALJ also noted that Dr. Chen reported a slight Tinel's sign only on the right side and even more minimal findings on the left, and that Plaintiff had full ranges of motion in all of his fingers and in both of his wrists, as well

---

[19] Dr. Chen actually opined that Plaintiff could "continuously" handle, bilaterally (*see* tr. 384), but the ALJ limited bilateral handling to frequent.

[20] The undersigned has found no specific diagnosis of left-sided CTS in the record (prior to Plaintiff's report to Dr. Chen and Dr. Chen's subsequent assessment of bilateral CTS) and no recommendation or prescription for wrist braces, and Plaintiff has pointed the court to no such documentation in the record.

symmetric grip strength (*see* tr. 29–30, 380). Dr. Chen also specifically stated that Plaintiff was able to "perform fine manipulations," such as turning a door knob (*see* tr. 30, 380).[21] Furthermore, in her thorough decision, the ALJ discussed the very issue Plaintiff raises here. More specifically, the ALJ stated, "While the vocational expert did not specifically address the limitations on bilateral handling, fingering and feeling, she did consider the limitation on frequent handling and fingering with the right hand and found these occupations [mail clerk, electrical accessories assembler, and counter clerk] consistent with those limitations." (tr. 33–34). Thus, in sum, ALJ concluded that the right-sided limitation considered by the VE effectively covered the same—but unarticulated—left-sided limitation and, similarly, that Dr. Chen's physical examination revealed no left-sided deficits or yielded any opinions regarding Plaintiff's use of the left hand that—if articulated by the ALJ in questioning the VE—would have changed the VE's testimony or the ALJ's ultimate conclusions.

Plaintiff nevertheless claims error. He states that the DOT's job descriptions are outdated, and therefore the VE—and subsequently the ALJ (*see* tr. 33–34 (ALJ's noting that she also reviewed the DOT, after reviewing Dr. Chen's report, to confirm that the jobs identified by the VE required no more than frequent fine or gross manipulation))—erred in relying on those descriptions to conclude that Plaintiff could perform the three jobs identified by the VE. More specifically, Plaintiff contends that the mail clerk position now requires computer skills and, correspondingly, the use of both hands to perform fine manipulations, and the DOT has not been updated to so reflect; that electrical accessory assemblers are now required to, at times, use "two hands to grasp, manipulate, or assemble objects"; and that the counter position, which involves the processing of film, has "obviously changed significantly" since the DOT was last modified (doc. 19 at 13) (citing, with respect to the first two jobs, the "O*Net Crosswalk—Codes 57302 and 93905D," respectively). Plaintiff's arguments are unavailing.

First, the arguments are illogical. Plaintiff does not specifically claim that the ALJ erred in her consideration of his right wrist impairment and related limitations, and the record clearly establishes that most—if not all—of Plaintiff's problems are with his right wrist. Thus, if Plaintiff can use his right wrist/hand to perform the jobs identified by the VE he certainly can use his left

---

[21] Likewise, the ALJ found—at step three of the sequential evaluation—that "there was no evidence of an inability to perform fine and gross movements effectively," and thus she concluded that Plaintiff's "[CTS] does not meet the requirements of Listing 1.02B" (tr. 27). Notably, Plaintiff asserts no challenge to the ALJ's findings at step three.

wrist/hand to do so.  Second, if there is a conflict between the DOT and the jobs identified by a VE in response to the hypothetical question, the testimony of the VE "trumps" the DOT because "the DOT is not the sole source of admissible information concerning jobs."  Jones v. Apfel, 190 F.3d 1224, 1229–30  (11th Cir. 1999) (quotation omitted).  The DOT is not comprehensive, and the Social Security Administration does not consider it to be dispositive.  Id. at 1230.  Further, a VE is "an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments."  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004).  Although Social Security Ruling ("SSR") 00–4p states that when a VE provides evidence about the requirements of a job or occupation, the ALJ has an affirmative responsibility to ask about any possible conflict between the VE's testimony and the DOT, see SSR 00-4P, 2000 WL 1898704, at *1–2 (eff. Dec. 4, 2000), the ALJ did so here (see tr. 52).  Moreover, the VE here specifically noted that she did not rely solely on the DOT in reaching her conclusions.  Instead, she testified, she "supplemented information from the DOT and companion . . . publications" and did so based on her own knowledge or education and personal observations of people performing the jobs (or jobs similar to the jobs) she identified (see tr. 52; see also tr. 34 (ALJ's noting same)).[22]  Third, Plaintiff's counsel was given an opportunity to question the VE, and he did not ask her whether or how any "frequent" limitations in the use of Plaintiff's left upper extremity would affect his ability to perform the jobs the VE identified; nor did he object to the VE's reliance on the DOT or question her about any possible discrepancies.  See, e.g., Hurtado v. Comm'r of Soc. Sec., 425 F. App'x 793, 795 (11th Cir. 2011) (unpublished) (determining that even if a conflict existed between VE's testimony and the DOT, the ALJ did not err by relying solely on testimony of the VE because that testimony "trumps" the DOT, and the plaintiff did not object to the VE, his qualifications, or offer any evidence contradicting the VE) (citing Jones, 190 F.3d at 1229–30; Phillips, 357 F.3d. at 1240; SSR 00-4p); Leigh v. Comm'r of Soc. Sec., 496 F. App'x 973, 974–75 (11th Cir. 2012) (unpublished) (rejecting plaintiff's contention that the ALJ erred by relying on VE testimony that conflicted with the DOT where the VE stated his opinion was not inconsistent with the DOT, plaintiff did not offer any evidence controverting

---

[22] To the extent Plaintiff's arguments regarding the DOT are construed as also challenging the ALJ's finding that—even with frequent right-sided handling and fingering restrictions—Plaintiff could perform the jobs identified by the VE (though Plaintiff states the arguments relate to the ALJ's failure to include left-sided restrictions in the hypothetical question (see doc. 19 at 13)), the arguments fail for the same reasons discussed herein.

the VE's opinion, and plaintiff did not object to the opinion) (citing <u>Jones</u>, 190 F.3d at 1229–30; <u>Phillips</u>, 357 F.3d at 1240; SSR 00-4p).  Fourth, other than Plaintiff's report to Dr. Chen of bilateral CTS and Dr. Chen's opinion that Plaintiff was limited to frequent fingering and feeling with the left hand, nothing in the record of which the undersigned is aware demonstrates that Plaintiff is actually limited in such a manner.

In sum, Plaintiff's reliance on a minor discrepancy between the RFC and the ALJ's hypothetical question does not entitle him to relief because he has not, and cannot, establish that he was prejudiced, especially considering that the ALJ acknowledged the discrepancy and noted that it made no difference with respect to her ultimate conclusions.  *See, e.g.*, <u>Hall v. Schweiker</u>, 660 F.2d 116, 119 (5th Cir. Unit A Sept. 1981) (reversal and remand based on disregard of a social security ruling may occur only when the plaintiff also shows that prejudice arose from that error)[23]; <u>Diorio v. Heckler</u>, 721 F.2d 726, 728 (11th Cir. 1983) (the ALJ's decision will stand when an incorrect application of the regulations results in "harmless error," because the correct application would not contradict the ALJ's ultimate findings); <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . .").  Likewise, Plaintiff's after-the-fact assertion that the VE's testimony conflicts with the DOT is woefully insufficient to entitle him to relief.

Based on all of the foregoing, it is clear that the ALJ's hypothetical question comprehensively described Plaintiff's condition and that the testimony of the VE accurately addressed his condition. Therefore, the did not err in relying on the VE's testimony to find Plaintiff "not disabled."

C.      Plaintiff Subjective Complaints of Pain and Other Symptoms

In his third ground for relief Plaintiff raises two sub-claims.  In one sub-claim he asserts that the ALJ erred in rejecting his subjective complaints of pain and other symptoms that are inconsistent with the RFC (doc. 19 at 17–19).  In Plaintiff's other sub-claim he asserts that the ALJ erred in crediting his testimony regarding medication side effects but not finding him disabled (*id*. at 15–16).

---

[23] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

In <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991), the court articulated the "pain standard," which applies when a disability claimant attempts to establish a disability through his own testimony of pain or other subjective symptoms.  The pain standard requires:  (1) evidence of an underlying medical condition and either (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. <u>Holt</u>, 921 F.2d at 1223 (internal citation omitted).  If a claimant testifies as to his subjective complaints of disabling pain and other symptoms, as Plaintiff did here, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations of completely disabling symptoms.  <u>Foote</u>, 67 F.3d at 1561–62.  Additionally, "'[a]lthough this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.'"  <i>Id.</i> at 1562 (quoting <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1255 (11th Cir. 1983)).  The credibility determination does not need to cite "'particular phrases or formulations,'" but it cannot merely be a broad rejection which is "'not enough to enable [the court] to conclude that [the ALJ] considered her medical condition as a whole.'"  <i>Id.</i> (quoting <u>Jamison v. Bowen</u>, 814 F.2d 585, 588–90 (11th Cir. 1987)).

The first sub-claim appears in actuality to be another attack on the ALJ's decision to discredit Dr. Chen's "frequent changes in position" opinion, as Plaintiff states: "In finding [Plaintiff] not credible beyond the extent of the [RFC] assessment, the ALJ rejected not only the testimony of [Plaintiff], but also the assessment and opinions of the orthopedic consultative examiner, Dr. Chen." (doc. 19 at 17).  To the extent this is indeed the same claim, it warrants no further discussion.  To the extent Plaintiff additionally or alternatively claims that the ALJ erred in rejecting any complaints of Plaintiff that are more restrictive than the RFC, the claim is unpersuasive.  The ALJ set forth the relevant pain standard (tr. 28) and then articulated a host of reasons for finding that Plaintiff's testimony—to the extent is inconsistent with the RFC—is not credible.

In discrediting Plaintiff's testimony the ALJ cited  many or all of the same reasons she cited for rejecting Dr. Chen's opinion.  These include, in summary, Dr. Slobodian's releasing Plaintiff to light to medium work, Plaintiff's history of conservative treatment "consisting primarily of routine physical exams and medication adjustments and refills," the lack of a recommendation for surgery

or referral to a specialist (other than with respect to the right wrist), no hospitalizations, largely benign physical examinations, and the lack of any functional restrictions imposed by Dr. Garg (or any other treating physician) (tr. 29–32).  The ALJ did not err in considering any of these factors and, as previously discussed, all of the factors are substantially supported by the record as a whole. The ALJ also noted that Plaintiff's "significant work history after the alleged disability onset date, while not [SGA], undermines [Plaintiff's] allegations regarding the extent of his functional limitations" (tr. 32).  The ALJ did not err in considering this additional factor.  *See* 20 C.F.R. § 404.1571 (work performed during any period in which a claimant alleges he was under a disability may demonstrate an ability to perform substantial gainful activity); Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (in discounting Plaintiff's complaints of pain, ALJ did not err in considering fact that claimant worked washing mobile homes during the adjudicated period); *see also* Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) ("it was also not unreasonable for the ALJ to note that Harris's . . . part-time work [was] inconsistent with her claim of disabling pain").

The court thus considers Plaintiff's remaining argument, that is, the other sub-claim set forth in this ground for relief.  In brief, Plaintiff claims the ALJ erred in crediting his testimony regarding medication side effects but failing to find him disabled.  In support, Plaintiff points to: (1) his testimony that "meclizine [which Plaintiff testified he takes for vertigo] causes him significant drowsiness, so that he has to spend about half of the day lying down"; (2) the testimony of the VE that a person could not perform the jobs she identified if the person could not sustain concentration for up to two hours due to medication side effects or pain; and (3) the ALJ's statement in her decision that she "'has given the claimant the benefit of the doubt' regarding medications causing him to be drowsy" (doc. 19 at 15–16 (citing and/or quoting tr. 49, 53, and 31, respectively)). Plaintiff then argues that the ALJ's "benefit of the doubt" statement means that she fully credited Plaintiff's testimony that he must spend about half a day lying down due to the side effects of his medication, and therefore according to the VE Plaintiff could perform no work.  Plaintiff's argument misses the mark because he has, at best, misunderstood the ALJ's statement or, at worst, taken the ALJ's comment out of context and essentially ignored her overall credibility finding.

The ALJ's statement, in full, is as follows:

> Finally, the undersigned has limited the claimant to simple, routine, repetitive tasks requiring attention and concentration for only two hours at a time in order to accommodate any medication side effects.  Although the claimant testified that his medication makes him drowsy, there is nothing in Dr. Garg's treatment notes showing that the claimant complained of drowsiness, or other ongoing side effects. The undersigned has given the claimant the benefit of the doubt.

(tr. 31).  When the ALJ's statement is read in context it is clear that she gave Plaintiff "the benefit of the doubt" only to the extent that she determined Plaintiff suffers from some medication side-effects, but not to the extent he alleged.   Moreover, to interpret the ALJ's statement in any other manner would be to ignore her overall credibility finding, namely, that Plaintiff's subjective complaints of pain and other symptoms are not credible to the extent they are inconsistent with the RFC.  It is also clear from the ALJ's statement that she declined to fully credit Plaintiff's allegations regarding medication side effects in light of the fact that he reported no such allegations to Dr. Garg, the physician who prescribed all of Plaintiff's medications, and did so over the course of many years.  Nevertheless, in giving Plaintiff the benefit of the doubt and thus finding that he experienced some medication side effects, the ALJ included in his RFC limitations to simple work and shortened concentration spans.  Therefore, the ALJ committed no error in evaluating Plaintiff's credibility.

VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**, that this action is **DISMISSED,** and that the clerk is directed to close the file.

At Pensacola, Florida this 12th day of March 2015.

/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**